

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

SONDRA CARTWRIGHT,                          )
                                            )
                    Plaintiff,              )
                                            )
v.                                          )        No. 9 CV 4298
                                            )
CITY OF CHICAGO, CHICAGO POLICE             )        **Judge George Lindberg**
OFFICER ALVIN JONES, STAR 19462,            )
LAMONICA LEWIS, STAR 16172,                 )        **Magistrate Judge Keys**
DOUGLAS NICHOLS JR., STAR 12412, and )       F I L E D
RONALD WATTS, STAR 2640                     )
                                            )
                    Defendants.             )        OCT 1 4 2010
                                                     Oct 14 2010
## RESPONSE TO UNDISPUTED FACTS           MICHAEL W. DOBBINS
## FOR SUMMARY JUDGEMENT               CLERK, U.S. DISTRICT COURT

1.-8. I agree with these statements.

9. Drugs were never sold out of abandoned apartments. The reference used by Johnson and Bell (Cartwright, Der. P. 34: 18-22) explains why I went outside that morning. It has nothing to do with statements about drugs being sold in abandoned apartments. Drugs were only sold in the back hallway of the building on the 1st floor. None of the references used by Johnson and Bell to support this statement mentions drugs being sold in abandoned apartments.

10. This statement is made out of context. There is no mention in reference that Mr. Pearson or anyone else sold drugs on the second floor. Mr. Pearson stated (Pearson Dep. Pg. 42: 1-24, 43: 1-24) stating that when he needed to give more drugs to the seller, he would meet them on the second floor to keep from going to the lobby.

11.-13. I agree with these statements.

14. There are never any surprise raids on the buildings (Pearson Dep. 39: 1-21) because of the number of people posted up outside working for the drug dealers, they are able to identify the

police vehicles as they approach the buildings, due to the frequency that the police officers come to the buildings, every member of the team is easily identified in plain clothes, every member of the tact team. There are no surprises.

15. Due to the frequency of the officers coming back and forth to the building, the officers and their cars are easily identified.

16. I agree with this statement.

17-18. I would not have known when the officers arrived or were present in the building, because I was in my apartment at the time.

19-21. I have no knowledge of these activities because I was in my apartment.

22-24. The arrest report contained in the package states the suspect ie. Sondra Cartwright received suspected narcotics from Mr. Pearson and fled into apartment # 210 and closed the door. In direct testimony Officer Jones testified that Mr. Pearson banged on apt. 210 the door opened and he passed something through to whoever answered. (Jones Criminal Testimony p. 11: 13-24 p.12: 1-24).

25. Mr. Pearson never knocked on my door, so there is no way that he could have been detained at my door. In the arrest report, Officer Jones stated he detained Mr. Pearson in the hallway.

26. I would not have known who was detained by the police; but I do know that there was no door on apartment 207,there was a steel security door frame on the entryway of the apartment, which, prevented entry and someone from sliding anything under the door or entering the apartment.

27. In the Declaration made by Sgt. Watts (Declaration1: 14) Sgt. Watts's states that he not Officer Jones asked Ms. Cartwright to open front door and when I refused Sgt. Watts not Officer Jones started kicking on the door which split open 2 minutes later after Sgt. Watts then states that

he heard Officer Jones say over his radio that Sondra Cartwright was running across the parking lot on the northeast corner of the building. In Officer Jones criminal testimony he stated that he never used his radio (Jones Criminal Testimony p. 34: 13-20) Officer Jones testified that he was trying to contact CHA and there was too much going on to radio his team (Officer Lewis criminal Testimony pg. 18: 1-14)

28. I agree with this statement.

29-30. Ms. Osborne stated that at no time would she give permission for police to enter an occupied apartment without a warrant, she has agreed to testify at trial if subpoena, I will subpoena her. I am still unclear as to whether Officer Jones had Ms. Osborne's personal cell phone or home numbers; because with the office being closed on Saturday that would have prevented him from calling her directly.

31. Sgt. Watts was the only individual I heard kicking on the door.

32. In (Cartwright Dep 69: 17-24, 70:1-13) I stated that while trying to flee from the police I slipped and fell from the window. After falling from the window, there is no way that I could have been seen hanging from the window.

33. In criminal testimony, Off. Lewis testified that a person could not see the parking lot from my apartment windows. (Lewis Criminal Testimony p. 17: 15-24)

34. The expert witness in the criminal case states that she did not test substances for fingerprints and could not testify that the drugs were in my possession.

35. Because there were no drugs in apartment, none could have been recovered from the window.

36. When the police entered my apartment, I was no longer in the apartment , so the police would not have known if I had used drugs or not.

37. I agree with this statement.

38. I agree with this statement.

39. I agree with this statement.

40. I agree with this statement.

41. I agree with this statement.

42. I agree with this statement.

43. It is a known fact that Sgt. Watt uses physical force to get his point across i.e. 8 OPS complaints stating that fact. Two included in package and I have personally seen him use physical force on others. At no time during direct or cross examination did Officer Jones mention Sgt. Watts (Criminal Testimony Off. Jones pg. 17: 23-24 pg. 18: 1-8)

It is ironic that as the supervisor of the tact team responsible for my arrest, and prolonged incarceration, Sgt. Watts never signed off on any arrest reports, as if he did not want his name mentioned in the case. In the criminal case he was named. His OPS complaints were entered as evidence, and he was requested to come to court, yet he never showed up.

In (Pearson Dep. Pg. 25: 5-16) after searching the building Watts came up with a bag of cocaine and Vanessa King told Sgt. Watts that the drugs were hers, and he stated "No baby girl you don't have to worry" he was going to put them on who he wanted to. This means he knew who's drugs they were before he came kicking on my door.

### Narrative

On November 3rd 2007, I was in my apartment at 574 E. 36th st. apt. 210, when there was a loud kick on the door. I said "who is it?" The voice on the other side of the door said "open the door you are going to jail." The voice belonged to Sgt. Watts. I then replied "I'm not opening shit." (Verbatim) Sgt. Watts continued to try to force the door open all the while stating that I was going to jail. I asked through the door what I was going to jail for I hadn't done anything. Sgt. Watts continued to kick the door without answering my question. When I saw that the door was about to give, I fled through the window and went through the park to Cottage Grove to a friend's apartment but no one was home. After being unable to get into my friend's apartment I went back across Cottage Grove and sat in the park unaware that the police were looking to place drugs on me. While sitting in the park Officer Lewis and another officer drove up on me, handcuffed me, placed me in an unmarked squad car and drove me back to 574 E. 36th st. where she took me back into the lobby of the building where they had detained at least 15 other individuals. I was never Mirandized. This is the first time I saw Officer Nichols. After being in the lobby the officer started taking everyone in handcuffs out of the building. I asked what I was being arrested for and an officer, whom I had never seen before, walked up to me, struck me in the face and knocked me to the ground. Someone stated to the officer that "you just hit a woman." And the officer replied "so the fuck what, leave her down there." After everyone was out of the building someone helped me up and I was taken to the patrol wagon. While in the patrol wagon a lady only known as Vanessa stated that she had about $700.00 in her pocket and that she was going to the offer it to Sgt. Watts, so no one "would go down for her shit" (verbatim) When we arrived at the station Sgt. Watts spoke to Vanessa first, and she was released first, They next interviewed and released everyone except Pearson, Niles, Gibbs and

myself. I was taken into the holding area of the 51st precinct and later transported to 26th and

California where I then found out what I was charged with. At no time before my arrest did I

know that I was being charged with felony drug possession. In dep. Mr. Pearson stated that

Vanessa had informed Sgt. Watts that the drugs were hers.

Sondra Cartwright

14 OCT 10

# EXHIBIT B

1          A.     Watts.

2                 I was, like, "Well, then, can I leave?"

3                 Like, "No.  Since you want to lie, you

4    can go out there with the rest of them."

5                 So they still searching the building.

6                 Then, after awhile, Sergeant Watts, he

7    come walking up with a bag of cocaine.

8          Q.     Okay.

9          A.     Now everybody that they got up in their

10   handcuffs, we know whose it is, so we're, like, "If

11   you-all don't claim you-all stuff, we tricking."

12                So Vanessa King -- whose stuff it was --

13   she politely said, "Sergeant Watts, them is mine."

14                He said, "No, baby girl.  You don't have

15   to worry about nothing.  I'm going to put this on

16   who I want to."

17                So, after they did all that, like about

18   ten minutes later, some one of them police officers

19   come bringing Sandra Cartwright in the floor in

20   handcuffs, slapped her to the floor.

21                Then they called for a paddy wagon, put

22   everybody in the paddy wagon.

23                Vanessa King's still trying to claim her

24   stuff when we get to the station and everything, so



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

39

1       A.      Yes.

2       Q.      And how would it be set up down there?

3   How would you -- how would they set it up to sell

4   drugs there in that building?

5       A.      Well, they had security on the front and

6   the back door.

7       Q.      Okay.  Tell me about it.

8       A.      And security on the street, where if

9   they're coming down the street, the people on the

10  street gonna let them know, "51's or the killers

11  coming down."  And the people that's right there at

12  the back door gonna tell the people that's standing

13  in the hallway served, and they gonna give the

14  people the stuff to clean up with.

15      Q.      Okay.  Now, how does security pass the

16  information?  Is it talking?  You know.  Yelling or

17  talking or cell phone or --

18      A.      Yelling, 'cause it's like they right

19  next.  It's like they right there.

20      Q.      So they can tell -- talk to each other?

21      A.      Yeah.

22      Q.      Okay.  And, typically, how many people

23  would be on the first floor, selling drugs?

24      A.      Probably about two or three.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

MISTER LUCKY TYRONE PEARSON                    JUNE 15, 2010

41

1      A.     I wouldn't be around.  They'd -- they'd
2   call me, tell me they through.
3      Q.     All right.  So you would not even be at
4   that building, is what you're saying.  Is that what
5   you're saying?
6      A.     Not really.  Sometimes, I'll be there.
7   Sometimes, I won't.
8      Q.     Would you be in the hallway with them?
9      A.     No.
10     Q.     Where would you be?
11     A.     Probably outside, on the back.  Or
12  outside, on the front.  Or around.
13     Q.     Would -- would everybody kind of meet
14  outside in the morning at that building?  You know.
15  Usually, people would be outside, hanging out?
16     A.     Sometimes, they would.
17     Q.     Okay.  Was that related to the drug
18  dealing?
19     A.     Sometimes.  Sometimes not, because they
20  used to be -- you know what I'm saying?  It ain't
21  used to be people out there to -- to get them the
22  stuff.
23     Q.     Who were most of the people that bought
24  the drugs?  People that lived within the project?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

# EXHIBIT C

1      A.   Uhm, I would be the first one.

2      Q.   Who was right after you?

3      A.   My partner at the time, Officer Nichols.

4      Q.   When you entered the building what, if anything, did

5   you see?

6      A.   There were male blacks running up that stairway in the

7   rear stairwell.

8      Q.   How many?

9      A.   Two.

10     Q.   Did you follow them?

11     A.   Yes.

12     Q.   Could you describe what happened next.

13     A.   When I came out on the second floor where they exited

14  at I saw them running, which would be southbound down that

15  hallway.

16     Q.   Did they eventually stop?

17     A.   Yes.

18     Q.   Could you describe what you saw when they stopped.

19     A.   The first individual stopped at apartment 210 and

20  knocked at the door and the door opened.

21     Q.   Did you have occasion to later learn that individual's

22  name?

23     A.   Yes.

24     Q.   Did you later learn his name to be Mister Pearson?

1    A.    Yes.

2    Q.    You said he stopped at 210?

3    A.    Yes, he did.

4    Q.    Approximately how far away from you was he when he

5    stopped at number 210?

6    A.    He had to be about 15 to 20 feet.

7    Q.    Could you please describe what the lighting conditions

8    were like in this hallway.

9    A.    There is artificial lighting like in this room.

10   Q.    What did you see him do?

11   A.    When the door opened he handed the person inside -- he

12   attempted to hand him three bags of suspect narcotics.

13   Q.    Were you able to see the person who was inside?

14   A.    Yes.

15   Q.    Do you see that person here in court today?

16   A.    Yes, I do.

17   Q.    Would you please point that person out and describe an

18   article of clothing she is wearing.

19   A.    Defendant in the blue DOC uniform there.

20        MS. ERNO:   Let the record reflect in court

21   identification of the defendant.

22        THE COURT:   The record will so reflect.

23        MS. ERNO:   Q.   What did you see her do?

24        THE WITNESS:   A.   She received two of those bags

1       Q.      In what direction were you looking straight forward,

2    to the left, to the right?

3       A.      The bedroom was actually would be off to my right.

4       Q.      And was the majority of the defendant's body inside or

5    outside, just to paint a clearer picture?

6       A.      She was outside the window.

7       Q.      What part of her body could you see?

8       A.      Her face and her hands.

9       Q.      Did she say anything to you?

10      A.      Nope.

11      Q.      What else did you observe at the same time you saw the

12   defendant's face out the window?

13      A.      Inside the window on the floor there by the window

14   sill was the narcotics that I saw her receive earlier.

15      Q.      How did you recognize them?

16      A.      It had the same packaging on them as the packaging I

17   recovered in the hallway.

18      Q.      What other observations did you make about this

19   apartment?  Was there any furniture in this apartment?

20      A.      There was just a bed in that bedroom.

21      Q.      Any other furniture?

22      A.      Not that I recall.

23      Q.      How about any other people?  Was anyone else inside

24   this apartment?

1      A.    No.

2      Q.    From the time you first saw the defendant open and

3   shut the door, being No. 210, to the time you saw her go out the

4   window, did you constantly stay outside that No. 210?

5      A.    Yes.

6      Q.    Did anybody else enter or exit that unit while you

7   were standing there?

8      A.    No.

9      Q.    After you saw the defendant go out the window, what is

10  the next thing you did?

11     A.    I radioed to other officers that she was running

12  across the parking lot.

13     Q.    And how were you able to see where the defendant was

14  running?

15     A.    I went to the window and looked out.

16     Q.    Was there anybody else that you saw out there running?

17     A.    No.

18     Q.    How long were you able to maintain the view of the

19  defendant?

20     A.    Until I lost sight of her when she went around the

21  back part of the building.

22     Q.    Did you receive any response by radio from your fellow

23  officers that they received your message?

24     A.    About a couple minutes later received a response that

1          MS. ERNO:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  A.  That's a possibility.

4          THE DEFENDANT:  Q.  That's the normal procedure?

5     A.    It's not a procedure, it's a possibility.

6     Q.    It's a possibility.  So in the 20 to 25 minutes you

7  were outside my door waiting for someone to come and open the

8  door, it was possible that I could have thrown the drugs out the

9  window and it would have been procedure for you to have someone

10 posted under the window?

11         MS. ERNO:  Objection.  Form of the question.

12         THE COURT:  Rephrase your question.

13         THE DEFENDANT:  Q.  In the 20 to 25 minutes that

14 you were at my door, why didn't you notify one of the other team

15 members that's on your team that was near the building that I

16 had fled to the apartment where the drugs were given to me in

17 the apartment and to post up under the window?

18         THE WITNESS:  A.  I was try together contact CHA

19 within the building.  There was a lot going on, there were a lot

20 of people arrested that day.

21    Q.    But at that time you knew exactly where the drugs were

22 located.  Why didn't -- protocol call for you to post up under

23 the window to prevent me from either fleeing from the window or

24 throwing the drugs out the window?

# EXHIBIT D

1    officer in your civilian outfit. I mean you are
2    more readily identified in your civilian clothes
3    than in a police outfit?
4          A.    Could you repeat that.
5          Q.    Daily when you are on patrol in CHA, you
6    wear civilian clothes?
7          A.    Yes.
8          Q.    So a person that lives in the community can
9    identify you as a police in your civilian outfits?
10         A.    Yes, displaying our --
11         THE COURT:    Objection is going to be
12   overruled. You can answer the question.
13         THE WITNESS:    Yes. We wear our badges.
14   BY MS. CARTWRIGHT:
15         Q.    This goes to the location of my apartment.
16   If someone was to testify that they looked out of
17   my apartment, would they be able to see the
18   parking lot or would they see the park? If you
19   look out the bedroom window of my apartment, would
20   you see the parking lot or would you see the park?
21         A.    I would be speculating, but I would say the
22   park.
23         Q.    You would see the park. You wouldn't see
24   the parking lot.

1              While you were in radio command with

2    Officer Jones, were you ever directed to post up

3    under Apartment 210?

4        A.  No.

5        Q.  Did he ever at any time say that I had

6    entered or that the drugs was in Apartment 210?

7        A.  No.

8        Q.  So what --

9        A.  Not to me.

10       Q.  On radio contact to any member of the team.

11   Was the team ever informed that the drugs was in

12   Apartment 210?

13       A.  I can't recall that.  I just know about my

14   position.

15       Q.  Is it procedure for -- if it is known that

16   the drugs are in a particular apartment, is it

17   procedure for either a blue and white, that's a

18   patrol car, or a detective car to post up under

19   the window where the drugs are suspected to be?

20   Is that part of procedure?

21       A.  Is it procedure that a blue and white

22   post --

23       Q.  Okay.

24           THE COURT:  Hold on a second.  Don't talk

# EXHIBIT E

11. At some point, I received a radio call from Officer Jones calling for a supervisor to the second floor of the Building.

12. Once on the second floor, I learned from Officer Jones that Sondra Cartwright, resident of apartment #210, was observed by Officer Jones to take possession of the two identical clear plastic bags of narcotics, and lock herself in the apartment.

13. I asked Officer Jones to call Ms. Osborne, Chicago Housing Authority's manager, to procure a key to Ms. Cartwright's front door. Ms. Osborne called back and told us that she could not find anybody to deliver the key, and we could force our entry into the apartment as long as we had probable cause to do so.

14. I asked Ms. Cartwright to open the front door, which request she refused, and then I started kicking the door, which split open about two minutes later.

15. Upon entry into the apartment, I heard Officer Jones say over the radio that Sondra Cartwright was running across the parking lot, located on the northeast corner on the back of the Building.

16. Then, in Ms. Cartwright's bedroom, I observed two identical clear plastic bags, each containing numerous smaller blue tinted baggies, each containing suspect crack cocaine, lying on the floor by the window sill, which I also saw Officer Jones pick up and place into one of his jacket pockets.

17. A couple of minutes later, I have learned that Ms. Cartwright was arrested by the officers at a nearby park.

18. Ms. Cartwright, among others, was taken to the Second District Police Station, where she was processed according with her charges.

OFFICE OF PROFESSIONAL STANDARDS

CR #305849
Page 4

## INVESTIGATION continued:

Obtained statement from the victim, Natayvia McDonald. McDonald stated that on the date and time of the incident, she woke up and saw Nooner arguing with Sgt. Watts. McDonald knows Sgt. Watts because she used to live in the same area. McDonald stated that Nooner asked Sgt. Watts for a search warrant and Sgt. Watts state, "This is the motherfucking projects, we don't need a search warrant for the projects." McDonald related that when Octayvia McDonald told Watts that she was going to call OPS, Sgt. Watts stated, "I don't give a fuck, fuck OPS they ain't shit, OPS ain't going to do shit. I just beat my fucking case, OPS ain't shit."

Sgt. Watts told McDonald to put on her shoes because she was going to jail. Octayvia McDonald and Sgt. Watts began arguing and directing profanities toward each other. Sgt. Watts referred to Octayvia McDonald as a bitch and Octayvia referred to Sgt. Watts as a bitch. Sgt. Watts handcuffed Octayvia McDonald and escorted her down the stairs. Natayvia was walking in front of them and heard Octayvia fall to the ground. McDonald turned around and saw Sgt. Watts attempting to help Octayvia McDonald to her feet. While outside, McDonald observed Sgt. Watts push Octayvia McDonald down onto a step. McDonald related that while inside the station, Sgt. Watts took drugs from another arrest and put some drugs on her. McDonald related that Sgt. Watts did not physically place drugs on her, but he put the information in the arrest report. McDonald was not physically abused. McDonald related that during the arrest, Sgt. Watts referred to her, Octayvia McDonald and Nooner as bitches. (Att #10)

Attempts to interview witnesses were met with negative results. (Att. #9A, 12, 13, 14 – 18)

Canvass of the location of the incident was met with negative results. (Att. #12)

Obtained Department Reports regarding the arrest of Octavia McDonald, Natayvia McDonald and Vincent Randle. Octayvia McDonald was arrested on 25 May 2005, at 1245 hours, at 527 E. 37th Place, for Obstructing Justice. According to the Lockup Screening Log, Octayvia was uncooperative initially, admitted to smoking "weed", had superficial cuts on her arms, has a mental disorder and attempted to commit suicide four months prior by cutting her wrists. Natayvia McDonald and Vincent Randle were arrested on the same date, time and location for Possession of Controlled Substance. (Att. #3, 4, 5, 20)

The CB Photographs of Natayvia and Octayvia McDonald does not depict any injuries. (Att #3A, 3B, 4A, 4B)

Obtained To/From Subject Report from Witness Officers Robert Gonzalez, #12152, Brian Bolton, #15903, Elsworth Smith, #11737 and Mary Walker, #4003. Officer Walker and Gonzalez described Octayvia McDonald as being loud, belligerent and directing

OFFICE OF PROFESSIONAL STANDARDS

CR #305849
Page 5

**INVESTIGATION continued:**

profanities toward the arresting officers. The witness officers denied observing Sgt. Watts commit any of the acts alleged against. (Att. #26 – 29).

Obtained a To/From Subject Report from the Accused Sergeant Ronald Watts. Sgt. Watts related that he entered Nooner's apartment to have a conversation with Nooner about the narcotic activity reported at 527 E. 37th Place with Nooner's permission. Sgt. Watts denied all allegations made against him. (Att. #32)

**CONCLUSION:**

| | |
|---|---|
| **Accused #1:** | **Sgt. Ronald Watts, #2640** |
| **Allegation #1:** | **Unfounded** |

Octayvia McDonald and Natayvia McDonald, alleged that Sgt. Watts entered the apartment of Pamela Nooner without a warrant or permission. In her statement, Octayvia McDonald stated that Nooner gave Sgt. Watts permission to search her apartment. Sgt. Watts also stated that Nooner gave him permission to enter her apartment. Based on the available evidence the R/I recommends that allegation #1 be Unfounded.

**Allegations #2 – 7: Not Sustained**

Octayvia McDonald and Natayvia McDonald, alleged that Sgt. Watts directed profanities toward them, pushed Octayvia McDonald down the stairs while handcuffed, pushed Octayvia McDonald down onto a step while outside, verbally abused the complainant and victims by referring to them as "bitches," falsely arrested the McDonalds and pushed Octayvia McDonald on the back of her head while escorting her to the lockup. Natayvia McDonald did not witness Sgt. Watts push Octayvia McDonald down the stairs, she heard Octayvia McDonald fall down the stairs and witnessed Sgt. Watts attempting to help Octayvia McDonald to her feet. Octayvia and Natayvia McDonald's statement corroborate the remaining allegations, but the witness officer denied observing Sgt. Watts commit the acts alleged against him. Furthermore, Sgt. Watts denied the allegations made against him. Based on the available evidence, the R/I recommends that allegations 2 – 7 be Not Sustained.

**OFFICE OF PROFESSIONAL STANDARDS**
**CHICAGO POLICE DEPARTMENT**
**Citizen Interview Report**

Date: 06 June 2005

CR / U / EO# 305849

_X_ Complainant ___ Victim ___ Witness (check one)          ___ Telephone     _X_ In Person

| Name of Person Interviewed | SS#/Form of ID | Sex | Race | Date of Birth |
|---|---|---|---|---|
| McDONALD, Octavyia | Refused | F | B | 13NOV87 |

| Address | Telephone No. | Work or Other Contact No. |
|---|---|---|
| 1501 E. 67th Place | 773-752-3698 | 773-425-0838 (Mother's Cell) |

| Location of Incident | Date of Incident | Time of Incident |
|---|---|---|
| 527 E. 37th Place (Inside & Outside) | 25MAY05 | 12:00 P.M. – 1:00 P.M. |

| Location of Interview | Time of Interview | C. R. |
|---|---|---|
| 10 W. 35th Street, Suite 1200, Chicago, IL | 11:17 A.M. | ATTACHMENT # |

| Investigator | Other Person(s) present |
|---|---|
| Inv. Lakeisha McMullen, #296 | Antonette McDonald, Mother |

The following is in essence but not verbatim a summary statement taken of the above named person relative to allegation(s) of misconduct by a Chicago Police Department member.

Octavyia McDonald was at her aunt's apartment (Pamela Nooner) with her sister, Natavia McDonald; aunt, Pamela Nooner; mother's friend, Sandra Shumaker; uncle, Charles Pictures; cousins Ebony Johnson, Erica Johnson, Eona Adams; uncle's friend "Christopher" (Air pump), talking about a friend's funeral. McDonald stated that someone was knocking on the front door and she asked who it was. McDonald stated that no one answered and everyone continued talking. McDonald stated that someone began knocking harder on the door and answered and everyone continued talking. McDonald stated that someone began knocking harder on the door and stating it's the police. McDonald related that she asked if the officers had a warrant and a male officer stated, stating it's the police. McDonald related that she asked if the officers had a warrant and a male officer stated, "We don't need no motherfucking search warrant. Nooner opened the door and saw "Sergeant Ronald Watts." McDonald stated that she knows Sgt. Watts from living in the same area as him.

Nooner asked Sgt. Watts if he had a search warrant and he stated, "We don't need no motherfucking search warrant, this is the jets." Nooner told Sgt. Watts if he thinks that he can find drugs in her apartment then he could go ahead and search it. Sgt. Watts looked at Natavia McDonald and told her to put on her socks and shoes because she was going to jail. McDonald asked Sgt. Watts why was her sister going to jail and Sgt. Watts stated that if he couldn't get her then he would take her sister, Natavia McDonald. McDonald related that she and Sgt. Watts began arguing back and forth. McDonald told Sgt. Watts that she was going to call her mother and Sgt. Watts stated fuck your mother, fuck you mother. McDonald told Sgt. Watts, fuck your mother. McDonald stated that her mother was going to call OPS. Sgt. Watts stated fuck OPS they ain't going to do shit. Don't you see I keep beating my cases. McDonald told Sgt. Watts that the "Feds" (federal government) was going to get him for selling drugs.

Sgt. Watts handcuffed McDonald and put her in the hallway, made her face the wall and threaten to "slap" McDonald. McDonald stated that Sgt. Watts pushed her down the stairs while she was handcuffed. McDonald stated that she fell down five concrete steps and landed on her left shoulder. McDonald stated that her Nooner came down the stairs and picked her up off the floor. McDonald stated that Sgt. Watts continued to tell her that he was going to "slap" her. Nooner told Sgt. Watts not to touch her niece. Sgt. Watts escorted McDonald down the stairs and outside the front door. McDonald stated that Sgt. Watts stated, "Sit your ass down," and pushed her down on a step.

McDonald stated that she was searched by a female, black, uniformed officer, 5'4", approximately 120 pounds, medium length brown and black hair, medium complexion, brown eyes. McDonald stated that Sgt. Watts stated that he was going to send McDonald to prison so that the girls in prison could rape her. OM   A.4.

OFFICE OF PROFESSIONAL STANDARDS

CR/U/EO #305849

Statement of Octayvia McDonald

McDonald stated that throughout the entire process of her arrest, Sgt. Watts referred to her and her mother, Antoinette McDonald, as bitches. McDonald stated that her mother was not there but Sgt. Watts was talking about her mother. McDonald stated that the female officer did not find anything on her or Natvia McDonald. O.M A.M. McDonald stated that Sgt. Watts took drugs from someone else that was arrested and put some on her and Natvia McDonald. McDonald stated that Sgt. Watts escorted her to the lockup area and as they were walking, Sgt. Watts continuously pushed her on the back of her head with an open hand.

McDonald stated that while she was in the lockup, she was not allowed to speak to anyone in charge upon her request. McDonald stated that she sustained a scratch to left shoulder and a scratch on her right arm. McDonald stated that she did not receive any medical treatment. McDonald stated that everyone that was in the house witnessed the incident. Everyone that witnessed the incident can be reached at (773) 268-2919, 527 E. 37th Place, Apt. 714. McDonald stated that Nooner may be afraid to cooperate because Sgt. Watts threatened to have her put out of her apartment.

McDonald stated that no one physically touched her sister Natvia McDonald. McDonald stated that Natavia McDonald witnessed everything. McDonald stated that Sgt. Watts referred to Natavia McDonald and Nooner as bitches. McDonald stated that Sgt. Watts has been harassing her by stopping in the street and staring at her since the incident. O.M A.M.

*Octayvia McDonald*

*Antoinette McDonald*

C. R. 305849

ATTACHMENT # 11

## V.    Statement of Claim:

State here as briefly as possible the facts of your case.  Describe precisely how each defendant is involved.  Include also the names of other persons involved, dates, and places. Do not give any legal arguments or cite any cases or statutes.  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. (Use as much space as you need.  Attach extra sheets if necessary.)

On Sept 26, 2004, at or about 4:00 p.m, I Gukold Brown plaintiffs. Were standing on 37th Pl near Vincenn, Talking to a friend Carlisa Thonas, I had made a drug transaction a few minutes enrlaier. A incident had just expired, were two girls had a altercasion. So there on the same street when a unmark car pulled along with other officer from tatical Unit 715. A Sgt Ronald Watts, proceed toward my direction and ask me to come there. By me just making a drug transaction I mention. I had drugs on my possession and on parole. I then proceded to run. The 1st officer and other from Tatical Unit 715 ran after me, and on feet and used walkie talkie. In there pursuit I spotted a building that was abanoned I enter that building, I don't know the extact address of this said building but this is were the incident of this officer used excessive force upon my arrest. As I enter this said building, I ran on a second fla Vacant apartment. And ran into a empty closet

C. R. 303640

ATTACHMENT # ___4___

trying to Hide from this officer. There was no more
than a few minutes had passed before I was discovered
my SGT Ronald Watts, and other officers from Unit
715. I had bought 2 Bags of Herion from the said
transaction, that I mention earlier. I had drop one
while running, but still had one bag and $5 dollars
that I told 1st officer about that was found in closet.
The First officer SGT Watts to interogate me about a
suppose package of Herion that I was alleged to have
Had. I told Him and others that I only had the
one bag and $5 dollars upon capture, and that was it
it. Him and this second officer Alvin Jones I'm am not
sure too certain about him, But he was the same
that testified at my preliminary hearing, but the
2 of them batter my body on 5 or 6 different
times from different interogation about this
alleged pack of Herion, that I never had in my
possesion The 2nd officer that testified at my
hearing, perjured under oath during testimony. By
me not having efficiate conusel I was bonded over.
During this incident or excessive fiece that
was used during the said interogation about

C. R. 303646
ATTACHMENT # 4

Revised 4/01

this alleged pack of herion that I never had.
A barrage of over 25 punches was committed
by 1st & 2nd officer on my chest and ribs area
I was struck with a 3/4 on neck and shoulder
by first officer. The second officer pulled
his pistol and threating to shoot me and pull
out another in his defense from me trying to
take the first one. There was a lady officer
present during this alttercation with 1st & 2nd
officer, I dont remeber her name, but she was
there during all of the above mention. Along
with other officer from Unit 715 roaming this said
building looking for alleged package. That was never
found on me or in the present of me. We must
of been in this said building about 30 or 40 min.
I was handcuffed and knock to floor on numerous
occasion during incident As wh we exit building,
there were a lot of people still on outside, that could
verify that we were in this said building, with this
officer of that Unit 715. Pending investigation and legal
representation we can pursue this matter at hand.
This is the thruth and whole truth about said matter

C. R. 303646

Revised 4/02

7 1/2

ATTACHMENT # 4

**VI.    Relief:**

State briefly exactly what you want the court to do for you.  Make no legal arguments.
Cite no cases or statutes.

I would Like the courts to bring forward plantiffs & defendant wittness. And to Have a fair and just hearing to determinded pain & suffering that I endure from the excessive force that this officer used upon my arrest And to be awarded damages from this civil Actions.

## CERTIFICATION

By signing this Complaint, I certify that the facts stated in this Complaint are true to the best of my knowledge, information and belief.  I understand that if this certification is not correct, I may be subject to sanctions by the Court.

Signed this ___10___ day of __21__, 20_07_

_Garold Brown_
(Signature of plaintiff or plaintiffs)

GAROLD BROWN
(Print name)

200400079045
(I.D. Number)

COOK COUNTY JAIL DEPT OF CORRECTIONS
2650 S. California Chicago IL 60608
(Address)

C. R. 303646

ATTACHMENT # 4

Revised 4/01                              8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Sondra Cartwright

_____ Plaintiff(s)

vs.

City of Chgo Et Al

_____ Defendant(s)

CASE No. No 9 CV 4298

JUDGE: Lindberg

### PROOF OF SERVICE

TO: City of Chicago Et Al
Johnson + Bell
33 W. Monroe

TO: _____

I, the undersigned (plaintiff/defendant), certify that on the 14 day of OCT, 2010, 2009, I served a copy of this Johnson + Bell to each person whom it is directed by way of Johnson + Bell.

Signature Sondra Cartwright

Name SONDRA Cartwright

Address 3414 Magnolia Dr

City/Zip Markham IL 60428

Telephone 708 · 331 · 0393